# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**CANDICE SORENSON o/b/o C.S., a minor**
          **Plaintiff,**

          **v.**                                              **Case No. 10-C-0582**

**MICHAEL J. ASTRUE,**
**Commissioner of the Social Security Administration**
          **Defendant.**

---

## DECISION AND ORDER

Plaintiff Candice Sorenson seeks judicial review of the denial of the application for supplemental security income ("SSI") benefits she filed on behalf of her minor son, C.S. Plaintiff alleged that C.S., then nine years old, was disabled due to a variety of conditions, including mild mental retardation and attention deficit hyperactivity disorder ("ADHD") (Tr. at 120, 127), but the Social Security Administration ("SSA") denied the claim initially (Tr. at 50) and on reconsideration (Tr. at 53), as did an Administrative Law Judge ("ALJ") after a hearing (Tr. at 56-67). The Appeals Council denied plaintiff's request for review (Tr. at 1-3), making the ALJ's decision the SSA's final determination on the application. See O'Connor-Spinner v. Astrue, 627 F.3d 614, 618 (7th Cir. 2010). For the reasons set forth below, I reverse the ALJ's decision and remand for further proceedings consistent with this decision.

## I. APPLICABLE LEGAL STANDARDS

### A.      Judicial Review

The court reviews an ALJ's decision to ensure that it applies the correct legal standards and enjoys the support of substantial evidence in the record. See, e.g., Campbell v. Astrue,

627 F.3d 299, 306 (7th Cir. 2010) (citing Castile v. Astrue, 617 F.3d 923, 926 (7th Cir. 2010)). "Substantial evidence" is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Id. Under this deferential standard, if reasonable people could differ as to whether the claimant is disabled, the ALJ's decision to deny the claim will be upheld. Elder v. Astrue, 529 F.3d 408, 413 (7th Cir. 2008). But this does not mean that the court acts as an uncritical rubber stamp. Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986). The court reviews the entire record, ensuring that the ALJ considered all relevant evidence rather than "simply cherry-pick[ing] facts that support a finding of non-disability while ignoring evidence that points to a disability finding." Denton v. Astrue, 596 F.3d 419, 425 (7th Cir. 2010). While the ALJ need not discuss every piece of evidence in the record, the court will remand a decision that skips over important evidence or lacks an adequate discussion of the issues. Villano v. Astrue, 556 F.3d 558, 562 (7th Cir. 2009). Further, because judicial review is limited to the reasons provided by the ALJ in her decision, the Commissioner's lawyers may not fill in any gaps in the ALJ's analysis. See, e.g., Campbell, 627 F.3d at 306 (citing Larson v. Astrue, 615 F.3d 744, 749 (7th Cir. 2010)). Finally, if the ALJ commits an error of law, such as violating the agency's rules and regulations for evaluating disability claims, see Moss v. Astrue, 555 F.3d 556, 561 (7th Cir. 2009); Prince v. Sullivan, 933 F.2d 598, 602 (7th Cir. 1991), the court will reverse without regard to the volume of evidence in support of the factual findings, White v. Apfel, 167 F.3d 369, 373 (7th Cir. 1999); Binion v. Chater, 108 F.3d 780, 782 (7th Cir.1997).

## B.    Childhood Disability Standard

The SSA applies a sequential three-step test for determining whether a child-claimant is disabled. Under this test, the ALJ asks: (1) whether the child is working, i.e., engaged in

substantial gainful activity ("SGA"); (2) if not, whether the child has a severe impairment, i.e. one that causes more than minimal functional limitations; and (3) if so, whether the impairment meets, equals, or functionally equals an impairment listed in SSA regulations as being presumptively disabling. 20 C.F.R. § 416.924.

In order to "meet" a Listing, the claimant must present evidence establishing all of its "criteria." See Baker ex rel. Baker v. Barnhart, 410 F. Supp. 2d 757, 760 (E.D. Wis. 2005) (citing Keys v. Barnhart, 347 F.3d 990, 992 (7th Cir. 2003); Maggard v. Apfel, 167 F.3d 376, 380 (7th Cir. 1999)). For instance, in order to meet Listing 112.05(D), pertaining to mental retardation, the claimant must demonstrate (1) significantly sub-average general intellectual functioning with deficits in adaptive functioning, (2) a valid verbal, performance, or full scale IQ of 60 through 70, and (3) a physical or other mental impairment imposing an additional and significant limitation of function. See 20 C.F.R. Part 404, Subpt. P, App. 1, Pt. B, § 112.05(D); see also Blakes ex rel. Wolfe v. Barnhart, 331 F.3d 565, 568-69 (7th Cir. 2003); Witt v. Barnhart, 446 F. Supp. 2d 886, 894 (N.D. Ill. 2006).

If the child-claimant does not meet or equal a Listing, he may nevertheless be found eligible for benefits based on "functional equivalence." The ALJ determines functional equivalence by rating the child's degree of limitation – "extreme," "marked," "less than marked," or no limitation – in six "domains": (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1). Marked limitations in two domains or an extreme limitation in one results in a finding of disability. § 416.926a(a).

## II. FACTS AND BACKGROUND

**A.    Medical/School Records**

As indicated above, plaintiff alleged disability in this case based primarily on C.S.'s limitations in concentration and intellectual functioning.  The medical records in the transcript begin with notes from the Altru Clinic in North Dakota dated October 2006 to September 2007, which indicate that C.S. was prescribed Concerta, a medication used to control symptoms of ADHD,[1] and Ambien, used to treat insomnia.[2]  His prescriptions were at times refilled by phone, and the records contain several notations that plaintiff reported no concerns and that C.S. was stable on his medications.  (Tr. at 260-69.)

In September 2007, C.S. began receiving care at the Spirit Lake Health Center from Dr. Michael Tilus.  The initial note, dated September 24, 2007, indicates that plaintiff presented for emergency medication evaluation, as C.S. had been without his medications since the previous Friday.   The  doctor  diagnosed  ADHD  and  provided  thirty-day  conditional  medication management support.  (Tr. at 289-91.)  Notes from October 2007 discuss plaintiff's mounting frustration with C.S.'s behavior problems and his school's response.  (Tr. at 287.)  On October 10, plaintiff reported that she had been called to school every day that week regarding C.S.'s conduct, and on October 24 Dr. Tilus held an "intervention" with C.S., plaintiff, and C.S.'s teachers to discuss his growing behavioral problems at school.  (Tr. at 281; 344.)  An October 31 note indicates that C.S. had been kicked out of school due to his conduct.   (Tr. at 338.)

C.S.'s October 2007 (fourth grade) individualized education program ("IEP") confirms

---

[1]http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000606.

[2]http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000928.

4

these problems, noting that C.S.'s behavior impeded his learning and the learning of others. (Tr. at 137-38.) He displayed below average intellectual ability, with a full scale IQ of 78, and previous testing revealed that he met the criteria for ADHD. He demonstrated difficulty managing his time and materials, following directions, and completing tasks without assistance. (Tr. at 138.) He read at a 2.2 grade level and demonstrated behavioral problems in his reading group. He received math instruction in a very small group. (Tr. at 139.) The IEP further indicated that he has trouble complying with teacher instructions and would at times shut down, put his hood over his head, and lay on his desk. On other days he made noises and interrupted the teacher. His mother also expressed concerns about his behavior at home. He was easily distracted and needed many reminders to stay on task, but he was able to take care of his personal needs independently. (Tr. at 140.) C.S. was to receive approximately ½ of his instruction in the regular classroom and ½ in the resource (i.e., special education) room. (Tr. at 148.)

C.S.'s fourth grade teacher also completed a questionnaire evaluating the domains. In acquiring and using information, she generally rated him as having a "slight" or "obvious" problem on most of the areas listed on the form, writing that he was often off-task during whole class instruction and very dependent on teachers at times. (Tr. at 151.) In the domain of attending and completing tasks, she rated C.S. as having a slight problem in most of the listed areas. She wrote that C.S. was very disorganized and usually would not do his work unless someone was next to him urging him to continue. (Tr. at 152.) In the domain of interacting and relating to others, she noted a "very serious problem" in the area of expressing anger appropriately; a "serious problem" in the areas of seeking attention appropriately, following rules, and respecting/obeying adults; and a "slight problem" in most of the other areas listed

5

on the form. She wrote that C.S. often refused to work with others or in the classroom and wanted complete attention on him. (Tr. at 153.) In the area of moving about and manipulating objects, she rated no or a slight problem in the listed areas. (Tr. at 154.) In the domain of caring for himself, she rated a "very serious problem" in the areas of handling frustration appropriately and responding appropriately to changes in mood, a serious problem in the area of using appropriate coping skills, and an obvious problem in the areas of appropriately asserting emotional needs and knowing when to ask for help. The teacher wrote that C.S. frustrated easily, refused to listen to teachers, said inappropriate things to them, pushed things and knocked over tables and chairs, and threatened teachers and wandered wherever he pleased. (Tr. at 155.) In the domain of health and physical well-being, the teacher noted that without medication C.S. acted "very goofy, has little attention and can be defiant." (Tr. at 156.) The teacher suspected bipolar disorder, as C.S.'s behavior would be excellent one day and terrible the next, "much like a roller coaster." (Tr. at 156.)

On November 15, 2007, David Kuna, Ph.D., completed a psychological evaluation of C.S. Dr. Kuna noted no bizarre mannerisms or behaviors, nor any autistic like mannerisms or behaviors. (Tr. at 172.) On the Wechsler Intelligence Scale for Children ("WISC-IV"), C.S. achieved a full scale IQ of 72, with his other scores ranging from 73 to 82, placing him at the borderline level of intellectual functioning, similar to past testing. (Tr. at 172-73.) His Wide Range Achievement Test ("WRAT-4") grade equivalent scores were 3.4 for word reading, 2.8 for sentence comprehension, 3.1 for spelling, and 3.2 for math computation, scores not significantly below expectation given his full scale IQ. Dr. Kuna noted: "If anything, by standardized testing, he is actually performing a little better than expectation which may indicate that he is, in fact, benefitting from educational efforts." (Tr. at 173.) Dr. Kuna found

no serious presentation for Asperger's or Pervasive Developmental Disorder (Tr. at 175), diagnosing ADHD, combined type, not well controlled with medication; disruptive behavior disorder, NOS; rule out oppositional defiant disorder; and borderline intellectual functioning; with a GAF of 50[3] (Tr. at 176).

On November 15, 2007, Dr. James Clinkenbeard, a psychiatrist, prepared an evaluation report, noting that C.S. had been on Concerta since age five, with the medication working effectively until this year. (Tr. at 177.) On mental status exam, Dr. Clinkenbeard found C.S. appropriately dressed and groomed, engaged, and demonstrating good eye contact. His mood was neutral and his affect appropriate. Dr. Clinkenbeard saw no evidence of autism, but C.S. did meet the criteria for ADHD combined type. Dr. Clinkenbeard opined that C.S. may be under-medicated given his growth since he was prescribed Concerta and therefore increased the dosage. (Tr. at 178.)

Plaintiff thereafter received Concerta through the Lake Region Human Services Center, with his medication primarily refilled via telephonic requests from plaintiff, and with plaintiff and C.S. at times missing in-person appointments with Dr. Clinkenbeard. (Tr. at 389, 391.) On January 17, 2008, plaintiff reported that C.S. was doing better on a higher dose. (Tr. at 390.) However, on March 14, Dr. Clinkenbeard recommended an even higher dose of Concerta,

---

[3]"GAF" – the acronym for "Global Assessment of Functioning" – is a rating of the person's psychological, social, and occupational functioning. Set up on a 0-100 scale, scores of 91-100 are indicative of a person with no symptoms, while a score of 1-10 reflects a person who presents a persistent danger of hurting himself or others. Scores of 81-90 reflect "absent or minimal" symptoms, 71-80 "transient" symptoms, 61-70 "mild" symptoms, 51-60 "moderate" symptoms, and 41-50 "severe" symptoms. Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32-34 (4th ed. 2000).

increasing from 72 to 90 mg, with plaintiff noting that C.S. still struggled in school and agreeing to the higher dose. (Tr. at 389.)

On April 1, 2008, Dr. Larry Burd evaluated C.S., then age ten and in the fourth grade, regarding his learning and socialization difficulties. Plaintiff reported increasing problems at school, each year getting worse, and receiving about three calls per week from the school. (Tr. at 308.) Dr. Burd found C.S. cooperative and conversant, lacking some insight and with some receptive comprehension deficits. (Tr. at 308.) On autism testing, C.S. scored in the "concerning category but not high enough to meet criteria." (Tr. at 309.) On WRAT testing, Dr. Burd noted a 1 ½ to 2 grade level delay in reading and a math ability at an ending grade 2/beginning grade 3 level. Dr. Burd noted that C.S. appeared to have generalized developmental delays, with an IQ in the mid-70s, roughly commensurate with his academic achievement. He had difficulty getting his work done, was oppositional, and defiant at school (although mostly low level defiance). Dr. Burd recommended an IEP as a child with "other health impairment" and a positive behavior management program. (Tr. at 309.) He also recommended collection of data on C.S.'s ADHD, once in the morning and once in the afternoon, using an ADHD rating scale. Dr. Burd suspected that C.S. was 1 to 1-½ grade levels behind and recommended repeat cognitive testing. (Tr. at 310.)

On April 3, 2008, C.S. was again evaluated by Dr. Kuna. On testing, C.S. had some difficulties, even with 72 mg of Concerta. By comparison, C.S.'s current scores indicated significant improvement, however, he continued to have some mixed findings, and it did not appear that his medications were optimal in terms of results on this test of attention and concentration. (Tr. at 392.)

On April 14, 2008, C.S. was evaluated by Dr. Jacob Kerbeshian, on referral from Dr.

Burd.  (Tr. at 304.)  Dr. Kerbeshian  assessed ADHD, combined type; oppositional defiant disorder; stereotypic movement disorder; and probable borderline intellectual functioning, with a GAF of 60.  (Tr. at 307.)  Dr. Kerbeshian believed that the major focus needed to be on getting the ADHD under better control, which hopefully would improve the oppositional defiant disorder as well.  C.S. was at greater than maximum dose of Concerta, and Dr. Kerbeshian suggested switching to a trial of Adderall.[4]  Dr. Kerbeshian also suggested genetic testing for fragile X syndrome.  (Tr. at 307.)  On April 15, Dr. Kerbeshian recommended reducing the Concerta dose back down to 72 mg, and plaintiff agreed as the higher dose caused no improvement.  (Tr. at 388.)

On April 21, 2008, C.S. saw Dr. Burd, with the doctor listing diagnoses of cognitive impairment, ADHD, and rule-out pervasive developmental disorder.  C.S.'s most recent cognitive testing from December 2004 revealed a full scale IQ of 78, with other scores between 77 and 91.  Dr. Burd recommended that C.S. continue with a positive reinforcement program at school, and undergo repeat IQ testing and testing for fragile X.  (Tr. at 311.)

On April 28, 2008, during a telephonic contact with the Lake Region Human Services Center, plaintiff denied any problems or concerns with regards to the Concerta medication.  (Tr. at 387.)  On April 29, C.S. saw Dr. Clinkenbeard, "doing okay on the present dose of medication."  (Tr. at 386.)  Dr. Clinkenbeard noted that C.S. was still struggling with ADHD, but plaintiff did not want to try Adderall at the time.  (Tr. at 386.)  During a May 2 phone call, plaintiff expressed concern about C.S. possibly experiencing mitral valve problems.  (Tr. at 385.)

On May 14, 2008, C.S. underwent cognitive testing with Leslie Rowan, Ph.D.  (Tr. at

---

[4]Adderall, a combination of dextroamphetamine and amphetamine, is used to control symptoms of ADHD.  http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000166.

312.)  On the WISC-IV, C.S. scored a full scale IQ of 70, with the other scores falling between 69 (mild mental retardation) and 88 (low average).  (Tr. at 314.)  On Asperger's Syndrome testing, C.S. scored "possibly" but not likely.  (Tr. at 315.)  In her summary, Dr. Rowan noted that the results of IQ testing revealed a full scale IQ in the borderline range, with some variability in his performance.  Assessment of his adaptive skills also revealed abilities in the borderline range, with agreement from his mother and teacher in most areas.  Regarding whether C.S. had pervasive development disorder (like his brother), observations of his behavior along with data from his mother and teacher were not supportive of such a diagnosis.  (Tr. at 315.)  Dr. Rowan noted that C.S.'s full scale IQ in the borderline range was not surprising, as he previously tested in that range.  However, there were some significant changes since the previous test, with plaintiff's verbal abilities declining about 20 points.  Dr. Rowan did not suspect motivational or attention variables.  Regardless, there "has been a lack of progress or a slowing of learning since his last testing that may be attributed to such factors as changing schools, poor attention, unrealistic expectations and behavioral problems in the school setting."  (Tr. at 316.)  She recommended that his IEP be reviewed to take into account all of these issues.  She diagnosed ADHD, by history; disruptive behavioral disorder, not otherwise specified; and borderline intellectual functioning, with a GAF of 60.  (Tr. at 316.)  She recommended an IEP review, a positive behavior management plan at school, classroom routines at certain times of the day, that classroom rules be made explicit, a speech/language evaluation, social skills training, and close follow-up with psychiatry to monitor his ADHD medication.  (Tr. at 316-17.)

On May 22 and June 23, 2008, plaintiff called for new prescriptions, noting that C.S. was "doing okay on his medication at this time."  (Tr. at 383, 384.)  On July 7, Dr. Burd reviewed the

testing from Dr. Kerbeshian and Dr. Rowan (Tr. at 321-22) and listed diagnoses of mild mental retardation, ADHD, and stereotypic mood disorder.[5]  Overall, he noted an improvement in C.S.'s ADHD and in his sleep.  However, he suspected that C.S.'s cognitive impairments had been greatly underestimated as a cause of his behavioral difficulties.  (Tr. at 318.)  On July 8, plaintiff advised a nurse at the Lake Region Human Services Center of Dr. Burd's diagnosis of mild mental retardation and the negative fragile X test.  (Tr. at 382.)

On July 17, 2008, C.S. saw Dr. Clinkenbeard, doing "okay" on his medication (Tr. at 381); plaintiff called for a refill on August 20, again noting that C.S. was "doing alright on that dose" (Tr. at 380).  On September 15, Dr. Burd recommended that C.S. schedule a re-evaluation with Dr. Rowan, and that plaintiff receive some respite care due to the strain of caring for C.S. and his brother.  (Tr. at 320.)  Plaintiff called for a medication refill on September 29.  (Tr. at 379.)

According to C.S.'s September 2008 (fifth grade) IEP, overall there had been improvement with his ADHD.  He was noted to do better in small groups, to be relatively quiet, and to enjoy one-to-one instruction.  However, when asked to do something he did not want to do he shut down completely; most of the time he was not distracting to others, although there were some incidents where he made noise and tried to interrupt others.  C.S. had a difficult time attending to task for long periods of time.  (Tr. at 213-14.)  The IEP team again decided to have C.S. spend part of the school day in the regular classroom and part in the resource room receiving one-to-one or small group instruction.  (Tr. at 221.)

Plaintiff continued to refill C.S.'s Concerta at the Lake Region Human Services Center

---

[5]Dr. Burd also noted that the fragile X testing came back normal.

11

from late 2008 to May 2009, generally reporting no concerns with the medication and on a few occasions missing appointments with Dr. Clinkenbeard. (Tr. at 368-78.) On June 15, 2009, plaintiff advised that the family was moving to Wisconsin (Tr. at 367), and on September 28, 2009, the Center closed their file (Tr. at 365). On October 16, 2009, plaintiff established care for C.S. with Dr. Aimee Ledesma in Pleasant Prairie, Wisconsin, seeking a refill of Concerta. (Tr. at 402-05.)

### 2. SSA Consultants

Following the filing of the application in November 2007, the SSA arranged for the matter to be reviewed by several consultants. On January 28, 2008, Harold Hase, Ph.D., completed a childhood disability evaluation form, finding that C.S. had a severe impairment but did not meet, medically equal, or functionally equal the listings. (Tr. at 247-48.) Specifically, Dr. Hase found less than marked limitations in the domains of acquiring and using information, attending and completing tasks, and caring for yourself; a marked limitation in interacting and relating to others; and no limitation in moving about and manipulating objects, and health and physical well-being. (Tr. at 249-50.) On February 7, 2008, Robert Brill, Ph.D., noted agreement with Dr. Hase's conclusions. (Tr. at 253-55.) On June 20, 2008, following plaintiff's request for reconsideration of the initial denial, another consultant, Roger Larson, reviewed and agreed with Dr. Hase's conclusions. (Tr. at 257-58.)

## B. Hearing Testimony

### 1. C.S.

At the hearing before the ALJ, C.S. testified that he was then eleven years and lived with his mother, brother, and sister. (Tr. at 11.) He stated that he was able to dress himself

12

(although his mother picked out his clothes), brush his teeth, tie his shoes, and comb his hair. (Tr. at 11-12.)  He testified that he attended "Renegades" Elementary School, although "renegades" was apparently the name of the school's mascot. (Tr. at 12.)  He stated that he was doing well in school and got mostly A's and B's.  He testified that he got along with his teachers but other students teased him because of his size. (Tr. at 13.)  He indicated that he had been disciplined just once that school year (Tr. at 14), but got in trouble several times the previous year for not participating in gym class (Tr. at 15).  He played on no sports teams but did participate in 4-H. (Tr. at 15.)  He stated that he received special help at school in the resource room, where he spent much of the day. (Tr. at 20.)  He said that he sometimes acted up and threw a fit if the teacher tried to force him to do something, but that happened just once that school year.  He testified that he generally did his homework. (Tr. at 21-22.)

C.S. testified that after school he rode the bus home, played with his dog, jumped on a trampoline, and played with his siblings. (Tr. at 17.)  He stated that he helped out around the house, doing dishes, taking out the garbage, and feeding the dogs. (Tr. at 18.)  He took Concerta daily, which made him feel "normal" and helped him get his work done at school. (Tr. at 19.)  No part of his body hurt or bothered him. (Tr. at 19.)  When asked if other children at school could do things he could not, he mentioned somersaults. (Tr. at 20.)  He stated that he got along with his mother and siblings. (Tr. at 20.)

**2.      Plaintiff**

Plaintiff testified that C.S. attended Bristol Elementary School; "renegade" was the name of the school mascot. (Tr. at 25.)  She stated that C.S. attended special education classes in the resource room for reading, math, and science, and that he had a difficult time in school, in particular adjusting after their move to Wisconsin.  She received a lot of calls during the week,

13

usually from the special education teacher indicating that he had "shut down" was would not do the work. (Tr. at 26.) More than once the teacher asked plaintiff to pick C.S. up. (Tr. at 27.) Plaintiff relayed one incident in which the principal called after C.S. shoved another student who teased him. (Tr. at 27-28.) She did not believe that he had repeated any grades and did not know what kind of grades he got. (Tr. at 28.) He got along "so-so" with teachers and had some issues with teasing by classmates. (Tr. at 29.)

Plaintiff testified that C.S. was able to dress, wash, and tend to his personal needs with some direction. He spent a lot of time outdoors with his dog and playing with his BB gun. (Tr. at 30.) He helped out around the house, including feeding the dogs, taking out the trash, and at times doing the dishes. He was not at the time receiving psychological or psychiatric treatment but had in the past, and plaintiff was trying to obtain an appointment with a child psychiatrist. (Tr. at 31.)

Plaintiff testified that she started noticing problems when C.S. started school, which seemed to get worse as the grades progressed. She stated that when he was in the fourth grade the school suggested that he be home-schooled or attend ½ time due to his behavior. (Tr. at 32.) She explained that little things could set him off, like a request to wear a new shirt for picture day or an aborted skiing lesson. (Tr. at 33.) On one occasion he flipped over his teacher's desk after she tried to direct him to his seat. (Tr. at 35-36.) When things did not go well at school, he basically shut down and would not speak or do his work. (Tr at 37.) Plaintiff stated that she received calls from the school at least once a week. (Tr. at 39.) She testified that he had a hard time expressing himself, particularly after he would act up; he would say that he did not know why he had done it. (Tr. at 41.) Plaintiff testified that C.S.'s father's family had a history of cognitive delays and autism. (Tr. at 42.)

14

Plaintiff testified that C.S.'s doctors had diagnosed ADHD, starting him on medication (Concerta), and a cognitive disability. (Tr. at 34-35.) C.S. had not received mental health treatment for approximately fourteen months and received the Concerta from his family doctor. (Tr. at 44.)

## C.     ALJ's Decision

Following the three-step procedure, the ALJ determinated that C.S. had not engaged in SGA since the alleged disability onset, and that he suffered from the severe impairments of attention deficit hyperactivity disorder ("ADHD"), oppositional defiant disorder ("ODD"), disruptive behavior disorder, rule-out depression, rule-out Asperger's disease, borderline intellectual functioning ("BIF"), insomnia, and obesity, none of which met or medically equaled a Listing. (Tr. at 62.) The ALJ then turned to functional equivalence and the domains, finding less than marked limitations in acquiring and using information, and attending and completing tasks; marked limitation in interacting and relating with others; no limitation in moving about and manipulating objects; less than marked limitation in the ability to care for oneself; and no limitation in health and physical well-being. (Tr. at 65-66.) The ALJ accordingly found C.S. not disabled and denied the application. (Tr. at 67.)

## III.  DISCUSSION

Plaintiff argues that the ALJ erred in evaluating the credibility of the testimony presented at the hearing and in considering the Listings. I agree and thus remand for further proceedings.

## A.     Credibility

In evaluating credibility in this case, the ALJ stated: "After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could

reasonably be expected to produce the alleged symptoms, but that the statements concerning the intensity, persistence and limiting effects of the claimant's symptoms are not entirely credible." (Tr. at 65.) The Seventh Circuit has made clear that this boilerplate language, which routinely appears in ALJ decisions, is unacceptable. See Martinez v. Astrue, 630 F.3d 693, 694 (7th Cir. 2011); Spiva v. Astrue, 628 F.3d 346, 438 (7th Cir. 2010); Parker v. Astrue, 597 F.3d 920, 921-22 (7th Cir. 2010); see also Weber v. Astrue, No. 09-C-0912, 2010 WL 1904971, at *5 (E.D. Wis. May 11, 2010) (explaining that this sort of analysis turns the credibility determination process on its head by finding statements that support the ruling credible and rejecting those statements that do not, rather than evaluating credibility as an initial matter in order to come to a decision on the merits). As the court of appeals recently stated, "to read the ALJ's boilerplate credibility assessment is enough to know that it is inadequate and not supported by substantial evidence. That is reason enough for us to reverse the judgment." Punzio v. Astrue, 630 F.3d 704, 709 (7th Cir. 2011).

It may in some cases be possible to overlook the use of this seemingly ubiquitous language if, in the body the ALJ's decision, the court is able to find specific reasons for finding the claimant's allegations incredible or exaggerated, see, e.g., Hadley v. Astrue, No. 10-C-119, 2010 WL 3386587, at *18 (E.D. Wis. Aug. 26, 2010) (finding use of this language harmless given the other reasons provided by the ALJ); see also Rice v. Barnhart, 384 F.3d 363, 370 n.5 (7th Cir. 2004) (stating that "it is proper to read the ALJ's decision as a whole," and "it would be a needless formality to have the ALJ repeat substantially similar factual analyses" at multiple steps of the analysis"), but I cannot do so here. The ALJ set forth the appropriate standards from SSR 96-7p for evaluating credibility, but she nowhere provided any specific reasons for her credibility finding, as the Ruling requires. See Lopez v. Barnhart, 336 F.3d 535, 539-40

16

(7th Cir. 2003) (holding that under SSR 96-7p the ALJ must articulate specific reasons for her credibility finding).

The ALJ reviewed some of the medical reports (Tr. at 63-65), but she failed to explain how those reports supported an adverse credibility finding. The ALJ also noted that C.S. inconsistently followed up with a psychiatrist, missing appointments at times, and that his prescriptions were typically renewed over the phone, with plaintiff often reporting no concerns when she called for medication refills. (Tr. at 65.) However, the ALJ again failed to explain how this made the allegations less credible; nor did she consider any reasons why C.S. may have infrequently seen a doctor, as SSR 96-7p requires. The ALJ noted that C.S. was "maintained" on Concerta for his ADHD, without explaining how that made C.S. or plaintiff less credible or what "maintained" meant. Finally, the ALJ failed to explain whose statements she was considering, plaintiff's or C.S.'s or both, which only exacerbates her use of the boilerplate denial language.[6]

**B.    The Listings**

   **1.    Listing 112.05(D)**

The ALJ determined that none of C.S.'s impairments met or medically equaled a Listing, stating:

> No treating or examining physician has indicated findings that would satisfy the severity requirements of a listed impairment. In reaching the conclusion that the claimant does not have an impairment or combination of impairments that medically meet or equal a listed impairment, the undersigned has also considered the opinions of the State disability agency consultants who evaluated this issue at the initial and reconsideration levels of the administrative review process and reached the same conclusion[.]

---

[6]The Commissioner argues that the ALJ considered the collective statements presented at the hearing, but I cannot based on the ALJ's decision make that determination.

17

(Tr. at 62.)  This, too, was insufficient.

"In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing." Barnett v. Barnhart, 381 F.3d 664, 668 (7th Cir. 2004).  Here, the ALJ failed to identify any specific Listing, and her analysis, set forth in full above, can only be called perfunctory.

The error cannot be dismissed as harmless, as the record contains evidence suggesting that C.S. meets Listing 112.05(D).  As indicated above, under that Listing a child-claimant is deemed disabled if he demonstrates "significantly subaverage general intellectual functioning with deficits in adaptive functioning," along with a "valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant limitation of function."  Weber, 2010 WL 1904971, at *2.  According to the most recent IQ testing in the record here, performed by Dr. Rowan in May 2008,[7] C.S. scored 71 on verbal comprehension, 69 on perceptual reasoning, 77 on working memory, and 88 on processing speed, with a full scale IQ of 70.  As Dr. Rowan's report noted, while some of these scores fell in the borderline or low average area, 69 falls in the mild mental retardation range. (Tr. at 314.)  Further, in cases (like this one) where the IQ scores are derived from the Wechsler Intelligence Scale for Children ("WISC"), the SSA uses the lowest figure under Listing 112.05.  See 20 C.F.R. pt. 404, subpt. P, app. 1 § 112.00D9.  Indeed, on reviewing Dr. Rowan's testing, Dr. Burd made a diagnosis of "mild mental retardation."  (Tr. at 318.)  Thus,

_____

[7]When dealing with a child-claimant, the SSA requires that IQ test results "be sufficiently current for accurate assessment under 112.05."  "Generally, . . . IQ test results obtained between ages 7 and 16 should be considered current for 4 years when the tested IQ is less than 40, and for 2 years when the IQ is 40 or above."  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 112.00(D)(10).  The ALJ issued her decision in this case in February 2010 (Tr. at 67), so only Dr. Rowan's May 2008 testing would be considered sufficiently current under the regulation.

if these scores are valid and if C.S. also demonstrates significantly sub-average general intellectual functioning with deficits in adaptive functioning, along with a physical or other mental impairment imposing an additional and significant limitation of function, he would meet Listing 112.05(D). The ALJ found other severe impairments. (Tr. at 62.) The matter must therefore be remanded for consideration of the IQ scores and C.S.'s adaptive functioning. See Sherrod v. Astrue, No. 10-C-0451, 2011 WL 284349, at *8-9 (E.D. Wis. Jan. 25, 2011) (discussing the "deficits in adaptive functioning" requirement); see also Maggard v. Apfel, 167 F.3d 376, 380 (7th Cir. 1999) (explaining that under the mental retardation Listing IQ scores must be "valid").[8]

The Commissioner argues that based on C.S.'s history of scores suggesting borderline intellectual functioning the ALJ properly declined to find that C.S. met Listing 112.05(D). The Commissioner then proceeds to discuss the findings of Dr. Kuna; the reports of the consultants, Drs. Hase and Brill; and Dr. Rowan's conclusion that C.S. functioned in the borderline range. The Commissioner acknowledges that after Dr. Rowan's testing Dr. Burd adjusted his previous diagnosis to one of mild mental retardation, but argues that a mere diagnosis of mild mental retardation is insufficient to prove disability and suggests that Dr. Burd may have been doing a favor for his patient.

The problem with these arguments is that – aside from the ALJ's citation of the consultants' reports – none appear in the ALJ's decision. It is improper for the Commissioner's

---

[8]Plaintiff argues that I should reverse with a direction that benefits be granted under the Listing. But a judicial award is appropriate "only if all factual issues involved in the entitlement determination have been resolved and the resulting record supports only one conclusion – that the applicant qualifies for disability benefits." Allord v. Astrue, 631 F.3d 411, 415 (7th Cir. 2011). That standard is not met here, for the ALJ will on remand have to determine whether the scores of 70 and below are valid and whether C.S. has deficits in adaptive functioning.

lawyers to defend the denial of disability benefits based on evidence not relied on by the ALJ. Spiva, 628 F.3d at 348.[9]  Nor can the ALJ's reliance on the state agency consultants salvage her decision.  (See Tr. at 62, citing Ex. 1F, 2F, the reports from Drs. Hase and Brill.)  Dr. Hase completed his report in January 2008 (Tr. at 247-48) and Dr. Brill in February 2008 (Tr. at 255), before Dr. Rowan performed the May 2008 IQ testing.  Obviously, these consultants could not have taken that testing into account in developing their opinions.[10]  A third consultant, Dr. Larson, mentioned the May 14, 2008 testing, but the ALJ did not cite his report.  In any event, Dr. Larson wrote that the May 2008 testing revealed a full scale IQ of 70, reflecting borderline intellectual functioning.  (Tr. at 257.)  But the Listing  refers to scores of "60 through 70," 20 C.F.R. Pt. 404, Subpt. P, Appx. 1 § 112.05(D) (emphasis added), not scores below 70.[11]

As the Commissioner notes, the ALJ did, in another portion of her decision, mention Dr. Rowan's May 14, 2008 IQ testing.  However, the ALJ wrote that the testing "was within the borderline range" (Tr. at 66), which is incorrect.  As discussed, the applicable mental retardation Listing requires a score of  60 through 70, not a score below 70.  The Commissioner argues that Dr. Rowan, who listed a diagnosis of borderline intellectual functioning, was in the best position to interpret the results of the tests she administered, and that her diagnosis should carry more weight than Dr. Burd's.  Again, the Commissioner engages in improper post-hoc argument, as the ALJ engaged in no such weighing of the

---

[9]Further, as discussed in note 7, supra, only Dr. Rowan's test is "sufficiently current for accurate assessment under 112.05." Thus, the Commissioner's post-hoc reliance on the older tests also fails as a matter of law.

[10]Indeed, Dr. Hase listed IQ scores of 72 and 73.  (Tr. at 252.)

[11]Dr. Larson did not mention the score below 70.  (Tr. at 257.)

reports.  The matter must be remanded for consideration of whether C.S. meets Listing 112.05(D).

### 2.    Functional Equivalence

The ALJ found a marked limitation in C.S.'s ability to interact and relate with others.  (Tr. at 66.)  Thus, a marked limitation in any of the other domains would have resulted in a finding of functional equivalence.  But the ALJ found less than marked limitations in acquiring and using information, attending and completing tasks, and the ability to care for oneself.  (Tr. at 65-66.)  She skipped over important evidence in doing so.

In considering the domain of acquiring and using information, the ALJ failed to mention the IQ scores of 70 and below obtained by Dr. Rowan in May 2008.  Rather, in discussing this domain, she mentioned only the earlier scores of 72 and above.  (Tr. at 65.)   The IQ test Dr. Rowan administered in this case, the WISC, has a testing mean of 100 and a standard deviation of 15.  England v. Astrue, 490 F.3d 1017, 1021 n.5 (8th Cir. 2007) (citing § 112.00(D)(9)).  Thus, scores of 70 and below fall two standard deviations below the mean, id. at 1021, and under SSA regulations scores at least two standard deviations below the mean signify a marked impairment, 20 C.F.R. § 416.926a(e)(2)(i).  The ALJ must on remand consider this evidence.

The Commissioner argues that it was proper for the ALJ to place more emphasis on a longitudinal examination of all of the scores, instead of focusing on one lower score.  This is again a post-hoc argument, as the ALJ ignored the lower score, rather than explaining it away.  Further, the argument fails on the law, as the SSA requires current scores for children like C.S.  As discussed above, only Dr. Rowan's scores are sufficiently current under the regulation.  Finally, the Commissioner's reliance on the state agency consultant's reports, which the ALJ

21

did cite, fails because those doctors never saw the May 2008 test results.

Plaintiff criticizes the ALJ's discussion of the other domains as long on recitation and short on reasoning. Because the ALJ need only minimally articulate her reasoning, see, e.g., Berger v. Astrue, 516 F.3d 539, 545 (7th Cir. 2008), these arguments may not constitute an independent basis for reversal and remand. However, given the need to re-evaluate credibility and the Listings, as discussed above, it would behoove the ALJ on remand to offer better explanations on the other domains.

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **REVERSED**, and this matter is **REMANDED** for further proceedings consistent with this decision. The clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 18th day of March, 2011.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge